UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RED ONLINE MARKETING GROUP, LP, d/b/a 50ONRED, <br><br> Plaintiff, <br><br> v. <br><br> REVIZER LTD., <br><br> Defendant. | CIVIL ACTION NO. 2:14-cv-01353-RB <br><br> JURY TRIAL DEMANDED |

### DECLARATION OF STEPHEN GILL

I, Stephen Gill, declare:

1. I am a co-founder and chief executive officer of Red Online Marketing Group, LP d/b/a 50onRed ("50onRed"), a New Jersey limited partnership with a principal place of business at 2929 Arch Street, Suite 1101, Philadelphia, PA 19104, and the plaintiff in this case.

2. I have personal knowledge of the facts contained in this declaration.

3. I make this declaration in support of 50onRed's Motion for a Temporary Restraining Order and Preliminary Injunction.

**50onRed's Business**

4. 50onRed is a marketing company whose proprietary technology enables its customers to conduct, manage and optimize their digital advertising campaigns across its exclusive distribution network in the United States and internationally, including Israel.

3891533 v5

5.     50onRed's technology also enables software developers to generate a significant amount of revenue via advertising using our technology, products and services ("Monetization Services").

6.     50onRed created and markets advertising products that include its Ad Serving System, In-Text Advertising, "Whitespace" Banners, Recommended Content, E-commerce Coupons, Pop Advertising, and Price Comparison Advertising.

7.     50onRed was the first to offer and package all of these products using these names.

8.     These products provide the following services:

   a.   The Ad Serving System is a simple piece of software that controls all of our advertising products and is designed to be easily implemented into partner software.

   b.   In-Text Advertising scans an Internet page or digital content, and converts the words into relevant clickable advertising links.

   c.   "Whitespace" Banners is a technology that automatically detects available space on websites or other digital content where advertising units may be displayed.

   d.   Recommended Content displays ad units to an Internet user for sponsored articles and/or advertisements related to content currently being accessed.

   e.   E-Commerce Coupons provide an Internet user with coupons or discounts relevant to content currently being accessed.

   f.   Pop Advertising is a full-page advertisement that appears based on certain triggers or conditions as a user is browsing the Internet.

   g.   Price Comparison Advertising shows an Internet user's multiple sources for a product for which she has been searching and compares the prices from these various sources.

9.     I personally prepared a chart reflecting 50onRed's business model, which is attached as Exhibit A and incorporated by reference.

10. 50onRed's customers are buyers of digital advertising through, in addition to 50onRed, advertising agencies, advertising networks, media buyers and Internet marketers.

11. These advertisers use 50onRed technology to get their ads in front of consumers by placing and managing their online media buys through the 50onRed platform.

12. 50onRed charges Advertisers for its advertising in a variety of ways including cost-per-click, cost-per-impression, cost-per-view, cost-per-action, and cost-per-sale.

13. 50onRed's proprietary technology enables online advertising to occur inside downloadable software applications.

14. 50onRed also offers proprietary technology that allows media buyers to manage their digital advertising campaigns.

15. 50onRed's customers operate throughout the United States and internationally in countries including Israel, where Revizer is based.

**Revizer**

16. Defendant Revizer is an Israeli limited liability company, with a principal place of business at Sderot Rothschild 3, Tel Aviv-Yafo 61999 Israel.

17. Until Revizer appropriated 50onRed's business model, it did not provide any products or services that competed with 50onRed's advertising technology.

18. Instead, it was a newly created business that developed and distributed software to allow users to find the lyrics for songs performed in music videos on the website, YouTube (www.youtube.com), and display the lyrics alongside the music videos. In June 2012, when the original agreement was signed, Revizer represented that this was its only product.

19. Revizer continues to develop and market this free, downloadable software under new names that include AdLyrics.net, O-To-Lyrics, SearchBetter and LyricsPod, among others.

**The Agreement between 50onRed and Revizer**

20. On June 11, 2012, 50onRed and Revizer entered a Publisher Master Services Agreement (the "Agreement), pursuant to which Revizer obtained a limited non-exclusive license to use 50onRed's proprietary "Monetization Services" solely in connection with its own downloadable software.[1]

21. The Agreement contains a non-compete clause, pursuant to which Revizer pledged not to "develop, market, sell, license or provide any software, technology or services that are similar to, or competitive with, the monetization services provided under the Agreement or [50onRed's] proprietary optimization and behavioral advertisement targeting technology, methodology, or algorithms," during the term of the Agreement and for six months after. Agreement at ¶ 5.2.

22. The Agreement further contains a provision that prevents Revizer from copying, creating or reverse-engineering 50onRed's software. The Agreement provides that Revizer promised not to "copy, modify, display, distribute, decompile, disassemble or reverse-engineer the Monetization Services, merge or bundle it with any other product or service, use it to create any other product or service, or attempt to derive the source code or the underlying algorithms or protocols for the Monetization Services." Agreement, Exhibit for JavaScript (JS) Implementation at ¶ 2.

---

[1] Because of the proprietary nature of 50onRed's contracts, which are heavily negotiated and whose terms 50onRed protects as confidential, *see* ¶ 31 below, 50onRed is not attaching a copy of the Agreement to this publicly filed brief. 50onRed will seek agreement with Revizer on the entry of a protective order and, in the interim, will make the Agreement available for in camera inspection if it would assist the Court.

4

23. Revizer further agreed that, during the term of the Agreement, 50onRed would exclusively provide all advertising on Revizer's software applications. Agreement, Exhibit for JavaScript (JS) Implementation at ¶ 4.

24. Pursuant to the Agreement, Revizer acknowledged that 50onRed has proprietary relationships with advertisers, other publishers and third parties (collectively, "50onRed's Partners"). *Id.* at § 5.2.

25. The Agreement prohibits Revizer during its term and for six months after termination from collaborating or contracting to "monetize" Internet traffic with any 50onRed Partners Revizer knows or reasonably should know have a relationship with 50onRed. *Id.*

26. The Agreement further prohibits Revizer from using any confidential information 50onRed disclosed to it, except as expressly permitted in the Agreement or as otherwise necessary for Revizer to perform its obligations or exercise its rights under the Agreement. Agreement § 5.1.

27. Under the Agreement, Revizer was permitted to distribute 50onRed's advertising products, which included Ad Serving System, In-Text Advertising, "WhiteSpace" Banners, Recommended Content, E-commerce Coupons, Pop Advertising, and Price Comparison Advertising described above, only on its own downloadable software applications.

28. Under the Agreement, significant revenue was generated by distributing 50onRed's advertising products and "JS tags" through Revizer's downloadable software.

29. Further, under the Agreement, 50onRed paid Revizer a share of the revenue generated.

30. Revizer agreed that "any breach" of its obligations to protect and not use 50onRed's confidential information or of its duty not to compete with 50onRed or circumvent its

business relationships "would result in irreparable injury, and that in the event of any breach or threatened breach thereof, the complaining Party will be entitled to seek injunctive relief in addition to any other remedies to which such Party may be entitled, without the necessity of posting bond." Agreement at § 5.3.

31. 50onRed's contracts are heavily negotiated and 50onRed protects the terms as confidential.

**Revizer Breached the Agreement**

32. Revizer, like most of 50onRed's customers, needed 50onRed's technology because it lacked its own advertising technology or products at the time it signed the Agreement.

33. As part of the contractual relationship between 50onRed and Revizer, 50onRed provided Revizer with confidential information, including but not limited to the identity of 50onRed's distribution partners, 50onRed's distribution practices and strategies, and access to 50onRed's proprietary software code and information about 50onRed's proprietary technology (the "Confidential Information").

34. 50onRed started creating its proprietary technology in 2007. It was the first to offer the advertising products described in paragraph 8 above, and is the industry leader in this market.

35. Since its inception in 2007, 50onRed has invested tens of millions of dollars and thousands of hours developing its proprietary software and technology, building its network of distribution partners, distribution practices and strategies, and marketing its products and services.

36. 50onRed's activities have included attending approximately 10 trade shows a year in the U.S. and internationally.

37. 50onRed, the first company to offer its distinct Internet advertising products, developed a highly specialized knowledge of the digital advertising business over the course of seven years.

38. 50onRed's knowledge of this market is reflected in the Confidential Information Revizer misappropriated, including without limitation: the identity of 50onRed's distributors, 50onRed's distribution practices and strategies, and access to 50onRed's proprietary software code and information about 50onRed's proprietary technology.

39. Revizer had pledged under the Agreement to hold the Confidential Information in strictest confidence, but, instead, Revizer wrongfully used the Confidential Information to enrich itself by creating a competing business.

40. In or around January 2013, unbeknownst to 50onRed at the time, Revizer began competing with 50onRed first by marketing and illegally brokering 50onRed's software to distributors, including those it learned of only through 50onRed, and other third parties.

41. Apparently buoyed by its success marketing 50onRed's products and services to third parties in violation of the Agreement, Revizer, upon information and belief, reverse engineered 50onRed's proprietary software, developed competing software, and began marketing its own version of the same Monetization Services 50onRed was providing Revizer in an effort to replace 50onRed's products in the marketplace with its own.

42. Revizer marketed its illicit version of the Monetization Services, even using 50onRed's names for these services, to 50onRed's distribution partners, among others.

43. Revizer was familiar with 50onRed's Partners distribution practices and strategies only because of 50onRed.

44. Revizer even designed its logo with the same color scheme 50onRed employs and created a substantially similar website and logo "look and feel."

45. Attached as Exhibits B through H are copies of Revizer and 50onRed's logos and screenshots of webpages reflecting their respective advertising products.

46. Revizer has admitted that, as a result of its actions, distributors and other partners have reason to believe that 50onRed and Revizer are the same company.

47. In a Skype conversation with Revizer, a potential distribution partner stated: "At first I didn't reach out b/c I [thought] revizer was just the same as 50onRed but in Isreal [sic]." Tom Zakheym, Revizer's chief marketing officer, responded: "haha...I can understand why." A copy of the relevant excerpt of the Skype conversation is attached as Exhibit I.

48. Skype is a software application that among other things, allows users to chat by exchanging messages via the Internet.

49. Upon information and belief, Revizer used Confidential Information it received by virtue of its contractual relationship with 50onRed to promote its own business and to the detriment of 50onRed.

50. In addition, during the same time frame, Revizer was no longer exclusively using 50onRed to provide advertising on all of Revizer's software applications, as required under the Agreement.

51. To the contrary, 50onRed recently learned that Revizer now has more than 245 of its own products that are not running 50onRed's Monetization Services and instead are running Revizer's competing and identical monetization services and technology.

52. A list of the 245 Revizer products 50onRed found that are not using 50onRed's Monetization Services is attached as Exhibit J.

53.     Revizer also wrongfully used 50onRed technology, in part, to create its own network of distributors who sell advertising on the Internet and through downloadable software.

54.     Revizer accomplished this by providing 50onRed technology, along with its own competing technology, to third-party software developers.

55.     The Agreement prohibits such use.

**50onRed Confronts Revizer with Its Multiple Breaches**

56.     50onRed became suspicious and met with Revizer's CEO and CMO at 50onRed's Philadelphia office on August 20, 2013, where 50onRed advised Revizer that 50onRed had reason to believe Revizer was illegally competing with 50onRed in violation of the Agreement.

57.     Revizer responded that it would reconsider its activities.

58.     Indeed, Revizer sent 50onRed an email on August 26, 2013, stating that it would no longer recruit or increase activity with its current customers, and would stop direct competition with 50onRed.

59.     The email stated in part: "Following our discussion on the subject, we decided to stop syndicating our js. As I told you we were not doing it so much before but now we made an official decision. We have a few legacy customers (less than 5) and wont [sic] necessarily refuse big deals if they approach us (depends on the company and size of the deal). But, we are not doing any recruitment or even increasing activity with our current customers." A copy of the August 26, 2013 email is attached as Exhibit K.

60.     "js" (in the August 26, 2013 email) refers to JavaScript, which is a language used to write software code.

61.     Revizer's statement that it would "stop syndicating our js" means that it would stop providing its competing software products to distributors.

9

62. The August 26, 2013 email gave 50onRed comfort that Revizer was responding to the competitive concerns 50onRed had raised.

63. On September 13, 2013, however, Revizer abruptly, and without any advance notice, paused distributing 50onRed's services even through Revizer's downloadable software as contemplated in the Agreement.

64. Revizer stated in a September 13, 2013 email, "A severe issue has been brought to our attention. We are still investigating it but were advised by our lawyer to pause until we do." A copy of the September 13, 2013 email is attached as Exhibit L.

65. Neither Revizer, nor 50onRed, terminated the agreement, which is still valid and still governs the relationship between the parties.

66. Despite repeated requests, Revizer never advised 50onRed of the nature of the purported "severe issue."

67. Separately and around the same time, Revizer merely told 50onRed that it disliked a new software feature 50onRed was testing.

68. 50onRed responded by turning the new feature off.

69. Approximately one month after sending the September 13, 2013 email, Revizer sought to renegotiate the Agreement and replace it with a new agreement.

70. Weekly and biweekly discussions ensued between 50onRed and Revizer, and drafts of a proposed new contract were exchanged.

71. Shortly before manufacturing a bogus "severe issue" and seeking to renegotiate the Agreement, Revizer, upon information and belief, was seeking financing to enable it to quickly increase its competing business.

72.     In August 2013, Revizer secured a $20 million investment from Pitango Venture Capital, an Israeli venture capital firm. In connection with this deal, Revizer reportedly was valued at $100 million.

73.     Revizer's entire business at the time of the investment was in competition with 50onRed's advertising services.

74.     A copy of a press release announcing the $20 million investment is attached as Exhibit M.

75.     This investment has enabled Revizer to grow exponentially. According to LinkedIn, Revizer added at least 53 employees in 2013 alone to a base of four employees in 2012.

76.     I personally reviewed the LinkedIn profiles of the Revizer employees and prepared a chart based on the hire dates that they publicly disclose.

77.     The majority of these new employees are in software engineering and sales, to assist Revizer to continue to grow its competing business in violation of the Agreement.

78.     After months of discussions and exchanges of a draft agreement, principals of 50onRed traveled to Tel Aviv in late January 2014 in a final effort to reach a new agreement that would have replaced the existing Agreement.

79.     Those discussions, however, led to neither an executed replacement contract nor any other mutual resolution.

80.     During the trip, and after meeting with many of its partners, 50onRed was shocked to uncover the size of Revizer's operations that plainly violate the Agreement and the magnitude of damages Revizer was causing to 50onRed's reputation and business.

81. After the trip, 50onRed continued its investigation, leading to the initiation of this action and the filing of this motion.

**50onRed's Proprietary Technology and its Secrecy**

82. 50onRed's Confidential Information is known only to essential executives and sales and technical personnel at 50onRed.

83. 50onRed shares its Confidential Information externally only with business partners that have signed contracts containing confidentiality provisions.

84. 50onRed carefully guards the secrecy of it Confidential Information

85. For instance, 50onRed safeguards its Confidential Information by storing it electronically through a secure service where access is limited as described above.

86. In addition, local storage is under lock and key with restricted access.

87. The Confidential Information constitutes and/or reflects 50onRed's valuable and commercially sensitive business and trade secrets.

88. 50onRed obtains value through the competitive advantage that it obtains from protecting the confidentiality of its Confidential Information.

**Revizer's Current Wrongful Activities**

89. Revizer now markets its competing services to distribution partners and advertisers via its website, http://www.revizer.com/.

90. On its website, Revizer claims:

    a. It has "Huge Global Reach";

    b. Its potential customers will "find out just how quickly and easily your ads can be displayed to millions of users on a daily basis";

    c. That "Revizer's systems are designed to offer the monetization of tomorrow. In an increasingly competitive market, Revizer has the ability to utilize advance technologies to push your brand toward higher profits";

    d.    That "Revizer is a complete all-in-one monetization solution for app developers that can be easily implemented via a unique code. Once implemented, Revizer will be able to present your users with targeted and optimized offers";

    e.    To software developers and 50onRed customers that Revizer will "monetize browser extensions", and "Generate higher revenues…with a simple piece of code that can be easily implemented into your software"; and

    f.    That its technology has "been seen in numerous website applications and have [sic] already provided hundreds of software developers with monetization opportunities and increased revenue in record times."

91. A copy of the relevant pages from Revizer's website are attached as Exhibit N.

92. Through each of these claims, Revizer admits an express violation of the Agreement.

93. Revizer also told 50onRed that it has more than 100 employees, and information on LinkedIn has confirmed at least 60 employees.

94. These employees have posted duties on their LinkedIn resumes that describe building competing products and services for Revizer.

95. A copy of the relevant LinkedIn pages are attached as Exhibit O.

96. 50onRed also discovered that Revizer is actively hiring for sales and engineering positions (posted on its website as of the date of this filing) to further build competing products and services.

97. For example, Revizer is seeking:

    a.    A "Java Team Leader" to "Develop high volume, real time, data processing systems over a complex, market leading, proprietary application server, serving over 40 billion [advertising] impressions per month";

    b.    A Director of [Advertising] Demand Partners. "At least 3 years experience in an online ad network"; and

        c.      An Account Manager to "Prospect, cold call, and sell our Monetization to new clients."

98.    A copy of the relevant pages from Revizer's website are attached as Exhibit P.

**Revizer's Actions Also Are Damaging to 50onRed's Relationships with Partners**

99.    Revizer's actions threaten to damage or destroy 50onRed's critically important relationship with its distribution partners.

100.    50onRed has multiple distribution partners with which it has confidential relationships and from which it derives significant revenues.

101.    Revizer is competing and marketing its own version of 50onRed's software to distributors, including 50onRed's Partners.

102.    Revizer was aware of the contractual relationships between the 50onRed Partners and 50onRed and indeed only knew of these partners through its relationship with 50onRed.

103.    Revizer employed wrongful means, without justification—including providing advertising services to 50onRed Partners it knows or reasonably should have known have a relationship with 50onRed.

104.    Revizer took these actions despite explicitly pledging in the Agreement not to compete with 50onRed and not to exploit 50onRed's Confidential Information or relationships.

105.    It is also likely that 50onRed would have attracted many more partners and contracts, had Revizer not interfered.

**Harm to 50onRed**

106.    Revizer's use of 50onRed's Confidential Information has diminished the competitive advantage 50onRed had gained in the marketplace through its software.

107.    It is further impossible to quantify the amount of money that 50onRed has lost as a result of loss of competitive advantage from Revizer's breach and misappropriation.

108. Revizer's delivery of competing products that 50onRed distributors and end-users mistakenly believe originate with 50onRed undermines 50onRed's efforts to provide excellent client support and service.

109. It further could lead to tarnishment of 50onRed's reputation because Revizer's products are of lower quality, leading to consumer dissatisfaction that could be directed at 50onRed.

110. Failure to grant an injunction would prove devastating to 50onRed's business.

111. Any harm to Revizer, although hard to imagine, may be discounted based on Revizer's wrongful conduct.

112. If Revizer were allowed to continue accepting advertising on its software applications from entities other than 50onRed; monetizing Internet traffic with 50onRed Partners it knows or reasonably should have known have a relationship with 50onRed; using confidential information 50onRed disclosed to it for Revizer's own benefit and to no benefit of 50onRed; marketing or using software, technology and services that are similar to and competitive with the services 50onRed provided to Revizer under the Agreement; and disclosing or using any of the confidential information, 50onRed would be injured in ways that could never be repaired, or compensated with money.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2014.

_____
Stephen Gill