IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RED ONLINE MARKETING GROUP, LP : | | |
| d/b/a/ 50ONRED, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 14-1353 |
| REVIZER, LTD. and | : | |
| REVIZER TECHNOLOGIES, LTD., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                                                                               February 2, 2015

Currently pending before the Court is the Motion by Plaintiff Red Online Marketing Group, LP, d/b/a/ 50onRed ("Plaintiff") to Dismiss Count One of the Counterclaim by Defendants Revizer, Ltd. and Revizer Technologies, Ltd. ("Defendants"). For the following reasons, the Motion is granted.

I.       FACTUAL AND PROCEDURAL HISTORY

Defendants are Israeli limited liability companies with their principal place of business in Tel Aviv, Israel. (Defs.' Answer to Second Am. Compl. With Affirmative Defenses and Countercls. ¶¶ 160–61.) Plaintiff is a New Jersey limited partnership with a principal place of business in Philadelphia, Pennsylvania. (Id. ¶ 162.) Both Plaintiff and Defendants operate in the "non-search monetization industry, offering products, known as monetization services, which allow software developers to distribute their products for free and generate revenue by showing targeted advertisements to the software's users." (Id. ¶ 163.)

In May 2012, Deniel Sagis, CEO of Defendant Revizer, contacted Plaintiff for the first time, seeking to add some of Plaintiff's products to its existing collection of monetization services. (Id. ¶ 164.) Mr. Sagis "made clear in his early communications with Plaintiff" that Defendant Revizer sought to distribute Plaintiff's monetization services, together with Defendant Revizer's own monetization services and those which Defendant Revizer obtained from third parties, to software developers (known as publishers) and along with Defendant Revizer's own downloadable software products. (Id. ¶ 165.) According to the Counterclaim, Defendant Revizer expected, "as is common in the non-search monetization industry," that Plaintiff would pay Defendant Revizer a share of the revenue that Plaintiff received from its advertisers when advertisements were shown to computer users. (Id. ¶ 166.) As of Defendant Revizer's first contact with Plaintiff, Defendant Revizer made it clear that it was also in the business of offering monetization services to developers of internet toolbars and add-ons. (Id. ¶ 167.) Defendant Revizer also explained to Plaintiff that it was distributing its monetization services to third-party publishers and that it planned to begin using them in its own add-ons and toolbars in the near future. (Id. ¶ 168.) Eitan Reshef, the account manager for Defendants' account with Plaintiff, received that information and informed Defendants, in a June 4, 2012 communication, that he would verify whether it was possible for Defendants to license some of Plaintiff's monetization services and distribute them, together with Defendants' own existing monetization services and those of the third parties Defendants had acquired. (Id. ¶ 169.) Plaintiff subsequently confirmed that such an arrangement was possible. (Id. ¶ 170.)

On June 6, 2012, Plaintiff sent a contract to Defendants that Plaintiff referred to as its "standard paperwork." (Id. ¶ 171.) According to the Counterclaim, in reliance on

communications between Mr. Sagis and Mr. Reshef and on Plaintiff's representation that the contract reflected "standard paperwork," Defendants "reasonably believed that the draft contract it received was consistent with the business relationship the companies had discussed, i.e. that it would allow Revizer to bundle some of 50onRed's monetization services together with other monetization services in exchange for a share of the revenue that 50onRed would realize from its advertisers as a result." (Id. ¶ 172.) Defendants "likewise reasonably believed that 50onRed's 'standard paperwork' was consistent with common practice in the non-search monetization industry, where it is a frequent occurrence for companies to partner in one area and compete in other areas." (Id.)

Mr. Sagis, relying on Plaintiff's representations and Defendants' understanding that the document presented was consistent with the parties' discussions, but without reviewing the document in detail, electronically signed Plaintiff's "standard paperwork" (the "Agreement") on Defendants' behalf on June 11, 2012. (Id. ¶ 173.) According to Defendants, Plaintiff did not disclose, and Defendants were unaware, that the Agreement contained provisions that were inconsistent with the business relationship the parties had discussed and which were inconsistent with common practice in the non-search monetization industry. (Id. ¶ 174.) Defendants allege that Plaintiff knew that Revizer had developed its own monetization services and intended to distribute them, with Plaintiff's services, to third-party software developers. (Id. ¶ 175.) Yet, Plaintiff included a clause in the Agreement stating that Revizer could not "develop, market, sell, license or provide and [sic] software, technology or services that are similar to, or competitive with, the monetization services provided under the Agreement or 50onRed's propriety optimization and behavioral advertisement targeting technology methodology, or algorithms."

3

(Id. (quoting Agreement, § 5.2, the "Non-Competition Provision").) Defendants also allege that although Plaintiff was aware that Defendant Revizer, like Plaintiff, acquired some of its monetization services from third party providers, Plaintiff included a term in the Agreement which stated that "[Plaintiff] shall be Revizer's exclusive provider for the Monetization Services that [Plaintiff] provided to Revizer at any time during the term of this Exhibit." (Id. ¶ 176 (quoting Agreement, Exhibit for JavaScript Implementation, § 4, the "Exclusivity Provision").) Plaintiff did not disclose to Defendant Revizer that those terms were included in the Agreement when Plaintiff presented it for signature, even though "50onRed knew [they] were inconsistent with the business relationship the parties had discussed and with common practice in the industry." (Id. ¶ 177.) Defendants allege "upon information and belief, the vast majority of 50onRed's contracts with third parties do not contain non-competition and exclusivity provisions such as those found in the Agreement" and that Plaintiff "falsely represented to Revizer that the Agreement was 50onRed's 'standard paperwork.'" (Id. ¶ 178.)

Beginning a few months after the Agreement was signed and continuing until September 2013, Defendants used some of Plaintiff's monetization services by embedding them in its own downloadable software and distributing them together with monetization services from other entities. (Id. ¶ 179.) Defendant repeatedly informed Plaintiff that it was developing and distributing its own monetization services, some of which competed directly with those offered by Plaintiff; frequently notified Plaintiff that it was using its collection of monetization services, some of which it had licensed from Plaintiff and some which it had not, with third party publishers; and disclosed to Plaintiff each time it started a relationship with a third party publisher that it had done so in order for Plaintiff to configure its software to properly track

revenue generated by that publisher. (Id. ¶¶ 180–82.) Defendant also repeatedly notified Plaintiff that it was using non-Plaintiff monetization services with its own downloadable products. (Id. ¶ 183.) In June or July 2014, Defendant launched its public website, which explained that Defendant was distributing monetization services to publishers. (Id. ¶ 184.) Until Plaintiff filed its lawsuit in March 2014, Plaintiff never informed Defendant that it was in violation of the terms of the Agreement, never demanded that Defendant cease developing monetization services, never demanded that Defendant cease distributing monetization services to publishers, and never demanded that Defendant exclusively use Plaintiff's monetization services. (Id. ¶¶ 185–88.) Defendant was not aware of the existence of the Non-Competition Provision or the Exclusivity Provision in the Agreement until approximately September 2013. (Id. ¶ 189.)

      Count One of Defendant's Counterclaim, Fraud in the Execution, alleges that Plaintiff misrepresented to Defendants, in email and through instant messaging, that the Agreement was Plaintiff's "standard paperwork" and that its terms were consistent with the business relationships the parties had discussed. (Id. ¶ 200.) Plaintiff failed to disclose to Defendants that it had included terms in the Agreement that were patently inconsistent with the parties' agreed-upon business relationship and with standard practice in the non-search monetization industry. (Id. ¶ 201.) "In reasonable reliance on [Plaintiff's] fraudulent misrepresentations and omissions, [Defendants' representative] signed the Agreement without reviewing it." (Id. ¶ 202.) Defendants allege that Plaintiff knew that the terms of the Agreement were inconsistent with the parties' agreed-upon business relationship and standard practice in the industry, and intended that Defendants would rely on its fraudulent misrepresentations and omissions. (Id. ¶¶ 203–04.)

On May 9, 2014, Plaintiff filed its Second Amended Complaint. On May 23, 2014, Defendants filed a Motion to Dismiss several of the claims in the Second Amended Complaint, which was denied on July 1, 2014. On July 15, 2014, Defendants filed under seal its Answer with Affirmative Defenses and Counterclaims. Plaintiff filed a Motion to Dismiss Count One of Defendants' Counterclaims on August 4, 2014. Defendants filed their Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss on August 21, 2014. Plaintiff filed its Reply Brief on August 29, 2014. Defendants filed a Sur-Reply Brief on September 10, 2014. Plaintiff's Motion to Dismiss Count One of the Counterclaims is now ripe for judicial review.

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III. DISCUSSION

Plaintiff moves to dismiss Count One of Defendants' Counterclaim because "fraud in the execution may not be maintained when, as in this matter, the claimant admittedly had the opportunity to review the Agreement."  (Pl.'s Mem. Supp. Mot. Dismiss Countercl. 1.)  Plaintiff also argues that Count One of Defendants' Counterclaim should be dismissed on the independent ground that Defendants have not identified any term that was omitted from the Agreement, which Plaintiff maintains is a prerequisite of stating a claim for fraud in the execution.  (Id. at 1–2.)  Finally, Plaintiff argues that Defendants' fraud claim should be dismissed because "it cannot be proven other than by parol evidence, which is prohibited from being considered when . . . the Agreement contains an integration clause."  (Id. at 2.)  For the following reasons, Count One of Defendants' Counterclaim is dismissed.[1]

### A. **Fraud in the Execution**

Plaintiff argues that because Defendant Revizer had the Agreement in its possession for five days before Mr. Sagis signed it on Defendants' behalf, Defendants had a reasonable opportunity to review the Agreement and cannot now claim fraud in the execution.  Defendants respond by arguing that the brief period of time during which Defendants could have reviewed the Agreement's terms does not bar Defendants' claim for fraud in the execution, and that Defendant Revizer "reasonably and justifiably thought" that Plaintiff's "standard paperwork" would be consistent with their earlier discussions.

"'Fraud in the execution' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential

---

[1] Because Count One of Defendants' Counterclaim is being dismissed on the ground that Defendants have not made the required showing for fraud in the execution, the Court need not reach Plaintiff's additional arguments regarding omitted terms and parol evidence.

terms.'" Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc., 85 F.3d 1098, 1107–08 (3d Cir. 1996) (quoting Connors v. Fawn Mining Corp., 30 F.3d 483, 490 (3d Cir. 1994)) (additional citations and quotations omitted). In Fawn Mining, the United States Court of Appeals for the Third Circuit reasoned that in order "to prevail on a defense of fraud in the execution, a party must show 'excusable ignorance of the contents of the writing signed.'" Fawn Mining, 30. F.3d at 491 (quoting Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992)) (additional citations and quotations omitted).[2]

In McCormick, the Third Circuit discussed its prior decision in Fawn Mining, stating that "we found that fraud in the execution was available as a defense because the union affirmatively led Fawn Mining to believe that the collective bargaining agreement it was signing would not require it to contribute to a pension fund and Fawn Mining had no opportunity to determine otherwise." Id. at 1108 (emphasis added). In Fawn Mining,

---

[2] The Third Circuit relied on a Ninth Circuit case for the proposition that "excusable ignorance" supports a valid defense of fraud in the execution. See Fawn Mining, 30 F.3d at 491 (quoting Sw. Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769, 774–75 (9th Cir. 1986), cert. denied, 479 U.S. 1065 (1987)). In Rozay's Transfer, the Ninth Circuit looked to the Uniform Commercial Code Section 3–305, comment 7, which states that "[t]he test of the defense here stated is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge." See Rozay's Transfer, 791 F.2d at 774–75 (citing U.C.C. § 3–305, cmt. 7 (2004). Comment 7 states further that "[i]n determining what is a reasonable opportunity all relevant factors are to be taken into account, including the age and sex of the party, his intelligence, education and business experience; his ability to read or to understand English, the representations made to him and his reason to rely on them or to have confidence in the person making them; the presence or absence of any third person who might read or explain the instrument to him, or any other possibility of obtaining independent information; and the apparent necessity, or lack of it, for acting without delay." Id.
 Other courts have noted that U.C.C. Section 3–305 "is meant to apply to an uneducated person, unable to read and determine that the document is not what it was represented to him to be and that he had no reasonable opportunity to be informed of its true character." State Bank of Albany v. Roarke, 458 N.Y.S.2d 300, 303 (N.Y. App. Div. 1983). While those decisions are not binding on this Court, their reasoning is nonetheless informative.

> on the day that the signature page was signed embodying the existence of an agreement between the parties, there was significant time pressure on both sides due to the fact that the mine was set to close the next day. The only document that the parties physically had before them was a signature page of a standard Wage Agreement. Although no document was attached to this page at the time, Fawn Mining claims that both sides intended the signing of this page to symbolize their agreement to all terms of the Wage Agreement other than the 1950 Plan provision and that both contemplated that this page, when formally executed by an appropriate official of the International, would be appended to a copy of the Wage Agreement with the 1950 Plan provision deleted.

Fawn Mining, 30 F.3d at 492. The court found that Fawn Mining demonstrated excusable ignorance and established fraud in the execution because

> [i]f an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud in the execution of the contract and that the agreement reflected in the executed document is void ab initio and unenforceable by the union. The employer has never manifested an assent to the terms of the alleged contract, and the written document purporting to evidence the agreement has been obtained by fraud.

Id. at 493.

By contrast, in McCormick, the Third Circuit stated that "undisputed facts" indicated that the party asserting the defense of fraud in the execution "had several opportunities to review the language of the agreement prior to its execution," and had that party "reviewed the agreement, he would have found the alleged error in the document and this entire dispute could have been averted." McCormick, 85 F.3d at 1108. The Third Circuit determined that fraud in the execution could not be asserted under those circumstances because there was no indication that the agreement at issue in that case was executed "'with neither knowledge nor reasonable

10

opportunity to obtain knowledge of its character or its essential terms.'" Id. (quoting Fawn Mining, 30 F.3d at 490) (additional citations and quotations omitted).

This case is distinct from Fawn Mining because although Defendants argue that the contract as written did not reflect their discussions, Defendants did have an opportunity to determine otherwise, since the contract was in their possession for several days before Mr. Sagis electronically signed it. Defendants assert that the terms in the Agreement do not match their discussions with Plaintiff and are inconsistent with "common practice" in their industry, but unlike in Fawn Mining, there was no surreptitious substitution of documents in this case. While Mr. Sagis may have been relying Plaintiff's representations and Defendants' understanding of what the terms of the Agreement would be, the fact remains that Mr. Sagis did not review the Agreement "in detail." (See Defs.' Answer to Second Am. Compl. With Affirmative Defenses and Countercls. ¶ 173.) Had Mr. Sagis, or any other of Defendants' representatives, more thoroughly "reviewed the agreement, he would have found the alleged error in the document and this entire dispute could have been averted." McCormick, 85 F.3d at 1108. Defendants argue that they "reasonably and justifiably thought" that Plaintiff's "standard paperwork" would reflect their earlier discussions, but Plaintiff's representations did not relieve Defendants of the responsibility to read the Agreement and determine its precise contents for themselves prior to signing it.

Defendants argue that their fraud in the execution claim is not barred because Plaintiff has not cited a case where receipt of a contract prior to signing precluded a showing of excusable ignorance. (Defs.' Resp. Opp'n Mot. Dismiss Countercl. 4.) Defendants rely on O'Kinsky v. Perone for the proposition that "[e]xcusable ignorance does not necessarily require a party to

11

have read or insisted on reviewing a copy of the written contract before signing." O'Kinsky, No. Civ.A.10-6075, 2012 WL 1382367, at *4 (E.D. Pa. Apr. 20, 2012). The cases the O'Kinsky court relied on in reaching that conclusion, however, concern circumstances where (1) the party asserting fraud in the execution "was excusably ignorant where it was under significant time pressure and the document it signed was only a signature page;" (2) the party asserting fraud was told he was signing an agreement for one construction project but actually signed a collective bargaining agreement; and (3) the party asserting fraud in the execution "signed two blank pages he was told would later reflect an agreement to hire [employees] but which were later filled in with a collective bargaining agreement covering all his employees." See id. (citing Fawn Mining, 30 F.3d at 490–91; Operating Eng'rs Pension Trust v. Gilliam, 737 F.2d 1501, 1504–05 (9th Cir. 1984)[3]; Roofers Local 30 Combined v. Plato Constr. Corp., No. Civ.A.04-0714, 2006 WL 516770, at * 5 (E.D. Pa. Mar. 1, 2006)).

In this case, however, Defendants have not pled facts showing they were under "significant time pressure" or that they were only provided with signature pages to the Agreement. They have not asserted that, aside from the differences in certain terms Defendants expected, the Agreement their representative signed was for some other collaboration other than what Defendants sought. Finally, Defendants have not alleged that their representative signed blank pages which were later filled in with an agreement. Defendants had a complete copy of the Agreement for five days before it was signed without having been reviewed in detail by their

---

[3] The O'Kinsky court also noted that while Gilliam "did not explicitly address fraud in the execution but rather focused on whether there was mutual assent to a contract . . . the court in Gilliam used an analysis similar to that of fraud in the execution, and many fraud-in-the-execution cases cite it, including [Fawn Mining] and Roofers Local." O'Kinsky, 2012 WL 1392367 at *4 n.6.

CEO,[4] whereas the plaintiff in O'Kinsky had been advised by an attorney with a significant conflict of interest, and did not receive a complete copy of the contract documents at issue until after he signed some documents that he believed represented a prior verbal agreement. Id. at *1, *5. The circumstances under which Defendants, in this case, received a copy of the Agreement and failed to thoroughly read it before signing are distinct from O'Kinsky and the cases that court relied on. Therefore, the O'Kinsky court's approach to excusable ignorance does not apply to Defendants.

Defendants next argue that their counterclaim should not be dismissed because other courts undertaking an excusable ignorance inquiry had a more complete evidentiary record before them. (Defs.' Resp. Opp'n Mot. Dismiss Countercl. 4–5.) However, Defendants put before this Court the statement of facts which revealed that they had the Agreement in their possession for five days but that Defendants' CEO did not review it in detail. If Defendants are aware of some additional facts or circumstances that prevented Mr. Sagis from thoroughly reading the Agreement prior to signing it, they should have alleged such facts in the Counterclaim.

Finally, Defendants argue that "[n]othing about the facts alleged in Revizer's Counterclaim suggests that [a showing of excusable ignorance] is impossible 'under any reasonable reading of the complaint.'" (Defs.' Resp. Opp'n Mot. Dismiss Countercl. 3 (quoting

---

[4] It should also be noted that the plaintiff in O'Kinsky was a fireman who had relied on "someone in a position of authority and expertise to explain the contract to him" and had asserted that "he is not a sophisticated contractor, being a firefighter by profession," facts which factored into the court's decision that the plaintiff had demonstrated excusable ignorance. See O'Kinsky, 2012 WL 1392367, at *4 (reasoning that in light of those facts, alleged "irregularities in the execution of the contract," and "the considerable length of the contractual documents," the plaintiff had demonstrated excusable ignorance). By contrast, the signatory party for the Agreement in this case was Defendants' CEO, who presumably either has some degree of experience with contracts or the ability to hire outside counsel to advise him.

McGovern v. City of Phila., 554 F.3d 114, 115 (3d Cir. 2009).) The standard for evaluating a counterclaim upon a motion to dismiss, however, is one of plausibility, not one of mere possibility. See Iqbal, 556 U.S. at 679. In light of that standard, Defendants' argument is not persuasive.

Based on the above discussion, Defendants had a reasonable opportunity to review the Agreement prior to their CEO signing it, and they have not established "excusable ignorance" of the Agreement's terms. Accordingly, Defendants have not made the required showing for a fraud in the execution claim, and Count One of Defendants' Counterclaim must be dismissed.

### III. CONCLUSION

For all of the foregoing reasons, the Court finds that Defendants have not set forth a viable counterclaim for fraud in the execution. As such, Plaintiff's Motion to Dismiss Count One of Defendants' Counterclaim will be granted and Count One of Defendants' Counterclaim shall be dismissed.

An appropriate Order follows.